**AMERICAN HORSE PROTECTION ASSOCIATION, INC., Plaintiff,**

v.

**Ann VENEMAN, Secretary of Agriculture, United States Department of Agriculture, et al., Defendants.**

**No. CIV.A.01–28(HHK/JMF).**

United States District Court, District of Columbia.

May 14, 2001.

Carlotta P. Wells, U.S. Department of Justice, Washington, DC, Russell James Gspar, Cohen Mohr, LLP, Washington, DC, Thomas William Millet, IV, U.S. Department of Justice, Civil Division, Washington, DC, for Plaintiff.

John J. McKetta, III, Pieter M. Schenkkan, Graves, Dougherty, Hearon & Moody, Austin, TX, for Defendants.

## MEMORANDUM OPINION

FACCIOLA, United States Magistrate Judge.

This case has been referred to me for resolution of Show Horse Support Fund, Inc.'s (the "Fund") Motion to Intervene. For the reasons discussed below, the Motion to Intervene is granted.

## I. BACKGROUND

This suit involves a challenge by a nonprofit organization to the legality of a particular Department of Agriculture program known as the "Horse Protection Operating Plan" ("Operating Plan"). The Operating Plan relates to the implementation and enforcement of the Horse Protection Act ("HPA"), 15 U.S.C.A. § 1821 *et seq.*, (1998) for show horse seasons 2001–2003. The HPA was enacted to prevent the practice of "soring" gaited horses, which is the process of inflicting pain on the lower areas of the show horse's front legs in order to produce a high-stepping gait. *See American Horse Protection Assn., Inc. v. Yeutter*, 917 F.2d 594, 595 (D.C.Cir.1990). The USDA established procedures through which Horse Industry Organizations ("HIOs") train and license individuals known as Designated Qualified Persons ("DQPs") to inspect "sore" horses. 9 C.F.R. § 11.1 *et seq.* (2001).

The Operating Plan that is the subject of this lawsuit is the third of such plans issued by the USDA in the hopes of improving the enforcement of the HPA regarding the detection of sore horses. Defendants' Memo in Support of Motion to Dismiss ("Def.Memo")

at 2. According to the USDA, the Operating Plan at issue "establishes [the] duties and responsibilities of Horse Industry Organizations ..." for the 2001–2003 show seasons. Def. Memo at 1. The Plan is the product of meetings between the Animal and Plant Health Inspection Service ("APHIS"), the service charged with administering and enforcing the HPA, and representatives of the HIOs. Upon conducting these sessions, the agency generated a Draft Operating Plan, which was circulated for comment by the HIOs. After additional negotiations with the HIOS, a final Plan was distributed for signature by the HIOs. According to plaintiff's complaint, the Plan at issue is effective upon signature by an authorized HIO representative and will remain in effect until December 31, 2003.

Plaintiff argues that the Operating Plan is an unlawful delegation of the Department's enforcement authority under the HPA in part because it relies on the HIO's assessment of penalties pursuant to private disciplinary rules, rather than enforcement according to the terms of the Act. Plaintiff's Opposition to Motion to Intervene ("Pl.Opp.") at 9. Further, plaintiff argues, defendants' Plan contravenes the Act because it provides that defendants will not institute Federal enforcement actions for violations of the Act if an HIO has already assessed a penalty. Pl. Opp. at 10. Plaintiff therefore seeks a court order (1) setting aside the defendants' decision to implement the Operating Plan, and (2) enjoining the defendants from taking any action to implement the Operating Plan. Pl. Opp. at 12.

## II. DISCUSSION

The Fund has moved for leave to intervene as of right and permissively pursuant to Rule 24 of the Federal Rules of Civil Procedure. Because I conclude that movant is entitled to intervene as of right, it is not necessary to reach their permissive intervention claim.

██ Upon timely application, Rule 24(a)(2) provides for an intervention of right:

when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action

may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

Fed.R.Civ.P. 24(a)(2).

The plaintiff does not dispute that movant's application is timely. Therefore, in assessing whether the movant is entitled to intervene as of right, the court must consider the Fund's standing, and 1) whether the movant has an interest in the transaction; 2) whether the action potentially impairs that interest; and 3) whether the alleged interest is adequately represented by existing parties to the action. *See Building and Const. Trades Dep't., AFL–CIO v. Reich,* 40 F.3d 1275, 1282 ( D.C.Cir.1994); *Nuesse v. Camp,* 385 F.2d 694, 699 (D.C.Cir.1967); *Natural Resources Defense Council v. EPA,* 99 F.R.D. 607, 609 (D.D.C.1983) ("*Natural Resources* ").

### A. *Standing*

██ In this circuit, a party seeking to intervene must establish the same constitutional standing it would have to establish had it commenced the lawsuit in the first place. *Building and Const. Trades,* 40 F.3d at 1282. A party seeking to intervene as a party in a case challenging agency action must establish injury in fact from the agency's action, that the injury was caused by the agency's action, and that the injury will be redressed by the court setting aside the agency's action. *Castro County v. Crespin,* 101 F.3d 121, 126 (D.C.Cir.1996). It would follow that, when a party seeks to intervene as a defendant to uphold what the government has done, it would have to establish that it will be injured in fact by the setting aside of the government's action it seeks to defend, that this injury will have been caused by that invalidation, and the injury would be prevented if the government action is upheld.

██ The Fund meets these requirements. The Fund consists of four member organizations: the Walking Horse Trainer's Association, the Tennessee Walking Horse Breeders & Exhibitors' Association, the Friends of the Show Horse and the Tennessee Walking Horse National Celebration. Motion to In-

tervene ("Mot.Intervene"), ¶ 8. Members of the fund therefore train the horse, breed them, and enter them in horse shows and exhibitions. Mot. Intervene, ¶ 9. Some of the Fund's members are also HIOs who operate the DQP programs, programs that are the subject of the Operating Plans. Mot. Intervene at 6. The Operating Plan for detecting and preventing soring directly affects how members of the Fund train the horses, the procedures that will be used to detect soring, and the disqualification of horses found to be sored. This Plan is, after all, the central document which regulates how they conduct the training of the horses they exhibit and how violations of that regulatory scheme will be detected and punished. The invalidation of the Plan will render nugatory all the efforts the Fund's members have made to date in assisting its creation and will lead to a period of uncertainty during which a new regulatory scheme is created. The Fund's members' training, breeding, and showing of horses will be jeopardized during this regulatory interregnum. Finally, there is a significant potential that the invalidation of the Operating Plan will lead to the promulgation of new regulations which will be more demanding of the Fund's members than the current Operating Plan. In law, as is life, the devil you know is better than the devil you don't. It is not fair for plaintiff to insist that the latter consideration is hypothetical; surely, plaintiff did not bring this lawsuit to lessen the demands on the Fund's members.

I therefore conclude that the Fund has standing to intervene.

### B. *Interest in the Lawsuit*

■ In *Building and Construction Trades*, the Court of Appeals discussed the requirements for intervention of right under Fed.R.Civ.P. 24(a)(2) and followed that discussion with the indication that the intervenor must establish standing. 40 F.3d at 1282. It would seem, therefore, at first glance that an intervenor must establish standing and the "interest in the litigation" which Fed.R.Civ.P. 24(a)(2) requires. But, it is impossible to conjure a case in which an intervenor would have constitutional standing to intervene but not have a sufficient "inter-

est in the litigation" to justify intervention under Fed.R.Civ.P. 24(a)(2). Indeed, it is interesting how the standing inquiry mirrors the Rule 24 inquiry. For example, it is equally difficult to understand how a party could show that agency action caused or will cause injury, the standing inquiry, and not prove that the interest in the transaction will be impaired by agency action, the Rule 24 inquiry. Perhaps in a jurisdiction which requires the intervenor to show standing, the standing inquiry subsumes the Rule 24 inquiry. It is not, however, necessary to tarry over that problem because this Circuit determines whether a party has a sufficient "interest in the litigation" to justify intervention by the most pragmatic test possible:

> We know of no concise yet comprehensive definition of what constitutes a litigable 'interest' for purposes of standing and intervention under Rule 24(a). One court has recently reverted to the narrow formulation that 'interest' means 'a specific legal or equitable interest in the chose'. *Toles v. United States*, 371 F.2d 784 (10th Cir. 1967). We think a more instructive approach is to let our construction be guided by the policies behind the 'interest' requirement. We know from the recent amendments to the civil rules that in the intervention area the 'interest' test is primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process.

*Nuesse v. Camp*, 385 F.2d at 700. Building on that foundation, the Court of Appeals stated in *Smuck v. Hobson*, 408 F.2d 175, 179–180 (D.C.Cir.1969) that, while the nature of the intervenor's interest in the litigation cannot be ignored, it is more profitable to place primary emphasis on the other provisions of Fed.R.Civ.P. 24(a)(2) which deal with impairment of the interest claimed and the adequacy of the representation of that interest by the existing parties.

■ By that liberal and forgiving standard, I can easily find that the Fund's participation in the litigation would not harm its efficient proceeding to a final resolution. In my view, the Fund's joining in the briefing of the parties' cross motions for summary judg-

ment will have little or no impact on the time it will take to take to adjudicate those motions. Finally, the participation of the persons most directly affected by the Operating Plan is utterly consistent with the notice and opportunity to be heard concerns that lie at the heart of the due process clause.

## C. *Impairment of Ability to Protect Interest*

■ In determining whether a movant's interests will be impaired by an action, courts in this circuit look to the "practical consequences" to movant of denying intervention. *See Natural Resources Defense Council v. Costle*, 561 F.2d 904, 909 (D.C.Cir. 1977) (*"Costle"*); *Natural Resources Defense Council v. EPA*, 99 F.R.D. 607; *Huron Environmental Activist League v. EPA*, 917 F.Supp. 34 (D.D.C.1996). Moreover, particularly in suits involving administrative law, courts in this circuit assess, along with impairment, the convenience to the movant of permitting intervention in the present suit as opposed to denying intervention merely because future challenges to agency action remain available. *See Costle* at 909–10 (permitting intervention by rubber and chemical companies seeking participation in settlement agreement even though future avenues of litigation remained open because their involvement "lessend[ed] the need for future litigation to protect their interests."); *Nuesse v. Camp*, 385 F.2d at 700.

■ Plaintiff argues that the Fund should not be permitted to intervene because this suit does not challenge the USDA's procedures for inspection of sore horses or its authority to improve enforcement with more consistent standards, which might arguably impair movant's interests. Pl. Opp. at 4. Rather, plaintiff contends, the suit challenges the USDA's "specific decision to continue to employ a defective plan" which plaintiff says has no legal impact on movant. Pl. Opp. at 6. While plaintiff attempts to characterize this suit as merely an issue of delegation, the practical consequences of plaintiff's obtaining the relief they seek is to set aside the Operating Plan proposed for 2001–03. As a result, movant's interest would be practically impaired because it could no longer rely on the current plan, and would have to participate once again in the discussion and comment process used to create an alternative plan.

In this respect, this case is similar to *Natural Resources*, 99 F.R.D. 607, a suit challenging the validity of the EPA's Regulatory Reform Measures, which permitted industry representatives to actively participate in EPA decision making through private conferences. These conferences allegedly influenced the EPA's Registration decisions regarding whether the registration of pesticides should be curtailed or suspended. Intervenors were industry representatives and pesticide manufacturers who participated in the decisional meetings that generated the registration guidelines and therefore had an interest in the procedures plaintiff's hoped to have set aside. The court concluded that movants had a cognizable interest in the litigation, since "[p]laintiff's complaint challenges procedures pursuant to which EPA reached preliminary decisions that the intervenors' pesticide products merited continued registration." 99 F.R.D. at 609.

Like the industry groups in *Natural Resources*, the Funds' members participated in the decision making process and are subject to the resultant agency program that directly impacts the obligations of the Fund's members with respect to the detection of sore horses. As in *Natural Resources*, a resolution favorable to plaintiff's would result in setting aside the program, a result which would eviscerate the HIO's efforts in creating the Plan at issue. As the court in *Natural Resources* indicated, ". . . the intervenor's interest would be practically impaired because they would have to start over again demonstrating to EPA the safety of their pesticide products." *Id.* at 609. The possibility that the USDA program relating to the HIO's duties and responsibilities regarding DQPs would be set aside satisfies the practical impairment element under Rule 24(a). *See id.*

Furthermore, while an outcome favorable to plaintiff would not impair the Fund's ability to challenge future Operating Plans or alternative guidelines used to set forth HIO

duties, the participation of intervenors in this lawsuit who represent the interests of the Walking Horse and Show Horse industries might minimize the need for future litigation as to these Plans. *See Costle* at 911. This interest in convenience, in addition to intervenor's demonstrated impairment, supports the Fund's intervention.

### D. *Adequacy of Representation*

Under Rule 24(a)(2), a movant who meets the requisite impairment of interests test may intervene unless his interests are "adequately represented" by existing parties. The Supreme Court has held that this burden is "minimal" and an applicant need only show that "representation of his interest 'may be' inadequate." *See Trbovich v. United Mine Workers of America,* 404 U.S. 528, 538 n. 10, 92 S.Ct. 630, 30 L.Ed.2d 686 (1972); *see also Natural Resources,* 99 F.R.D. at 610.

Plaintiff argues that the Fund's interests are adequately represented by the USDA and APHIS because they have identical interests in asserting that the Operating Plan is lawful. Pl.'s Opp. at 7. However, merely because parties share a general interest in the legality of a program or regulation does not mean their particular interests coincide so that representation by the agency alone is justified. *See Costle* at 912. In defending the Operating Plan, the USDA and APHIS represent a broad spectrum of interests, which includes the general public, groups aimed primarily at animal welfare, and organizations focused on the show horse industry. The intervenors, by contrast, have a more narrow interests and concerns related exclusively to the obligations of those who train and breed horses for show. *Id.* Therefore, while the USDA may have a general interest in defending the Operating Plan at issue, its obligations to interests other than those represented by the Fund may necessarily render its representation of the show horse groups inadequate.

Additionally, budgetary and manpower demands may drive how much time the USDA can devote to this litigation and whether it can settle this case with plaintiffs. The Fund obviously should be a party to those discussions and the expertise of its members may prove most useful and necessary to any such discussions.

### III. CONCLUSION

The movant, Show Horse Fund, Inc., has satisfied its burden under Rule 24(a)(2) and shall therefore be permitted to intervene as of right in this action. An order granting their motion will accompanying this Memorandum Opinion.

**SO ORDERED.**